UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X

MARK DINARDO,                 :      Case No.: _____

            Plaintiff,    :

     -against-     :      **COMPLAINT**

                 :      **DEMAND FOR JURY TRIAL**

MONTAGE RESOURCES CORPORATION, :
RANDALL ALBERT, MARK BURROUGHS, :
GENE DAVIS, DON DIMITRIEVICH,    :
RICHARD PATERSON, D. MARTIN     :
PHILLIPS, JOHN REINHART, DOUGLAS :
SWANSON, and ROBERT ZORICH,     :

           Defendants.   :
--------------------------------------- X

Plaintiff, Mark Dinardo ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This is an action brought by Plaintiff against Montage Resources Corporation ("Montage" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Montage, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the proposed merger between Montage and Southwestern Energy Company ("Southwestern") (the "Proposed Merger"). Plaintiff also asserts a claim against the Individual Defendants for breaching their fiduciary duty of candor/disclosure under state law.

2. On August 12, 2020, Montage entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which the Company's shareholders will receive 1.8656 shares

1

of Southwestern stock for each share of Montage common stock they own (the "Merger Consideration"). Based on the number of shares of Southwestern and Montage common stock outstanding immediately prior to the completion of the merger, it is estimated that Southwestern stockholders will own approximately 90% and Montage stockholders will own approximately 10% of the issued and outstanding shares of the combined company immediately following the completion of the merger.

3.      On October 6, 2020, in order to convince Montage shareholders to vote in favor of the Proposed Merger, Defendants authorized the filing of a materially incomplete and misleading definitive proxy statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act and in breach of the Individual Defendants' duty of disclosure.

4.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the sales process; (ii) financial projections for Montage and Southwestern; (iii) the valuation analyses performed by Montage's financial advisor, Barclays Capital Inc. ("Barclays"), in support of its fairness opinion; and (iv) Barclays' conflicts of interest.

5.      The special meeting of Montage shareholders to vote on the Proposed Merger is currently scheduled for November 12, 2020 (the "Shareholder Vote"). It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the Shareholder Vote so Plaintiff can cast an informed vote and properly exercise his corporate suffrage rights.

6.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and breach of the duty of candor/disclosure. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Merger until the material information discussed herein is disclosed to Montage's shareholders sufficiently in advance of the Shareholder Vote or, in the event the Proposed Merger

is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act and breach of the duty of candor/disclosure.

## JURISDICTION AND VENUE

7.     This Court has original jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

8.     The Court has supplemental jurisdiction over the state law claim for breach of the duty of candor/disclosure pursuant to 28 U.S.C. § 1367.

9.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over the Defendants by this Court permissible under traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman* 764 F.2d 1309, 1305 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* At 1316.

10.     Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, Montage's common stock trades on New York Stock Exchange, which is headquartered in this District, and Montage hired Barclays as its financial advisor for the purposes of the Proposed Merger, which is also located in this District, rendering venue in this District appropriate. *See, e.g.,*

*United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a holder of Montage common stock.

12.     Defendant Montage is an exploration and production company engaged in the acquisition and development of oil and natural gas properties in the Appalachian Basin. The Company's common stock trades on the NYSE under the ticker symbol "MR".

13.     Individual Defendant Randall Albert is, and at all relevant times has been, a director of the Company.

14.     Individual Defendant Mark Burroughs is, and at all relevant times has been, a director of the Company.

15.     Individual Defendant Gene Davis is, and at all relevant times has been, a director of the Company.

16.     Individual Defendant Don Dimitrievich is, and at all relevant times has been, a director of the Company.

17.     Individual Defendant Richard Paterson is, and at all relevant times has been, a director of the Company.

18.     Individual Defendant D. Martin Phillips is, and at all relevant times has been, a director of the Company.

19.     Individual Defendant John Reinhart is, and at all relevant times has been, the President and Chief Executive Officer of Montage and a director of the Company.

20.     Individual Defendant Douglas Swanson is, and at all relevant times has been, a director of the Company. Mr. Swanson is also the Managing Director of the Company's largest shareholder, EnCap.

21.     Individual Defendant Robert Zorich is, and at all relevant times has been, a director of the Company.

22.     The Individual Defendants referred to in ¶¶ 13-21 are collectively referred to herein as the "Individual Defendants" and/or the "Board", and together with Montage they are referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### I.     Background and the Proposed Merger

23.     Montage, formerly Eclipse Resources Corp, is an independent exploration and production company. The Company is engaged in the acquisition and development of oil and natural gas properties in the Appalachian Basin. It is the operator of the Utica Core Area and its Marcellus Project Area. The Ordovician-aged Utica Shale is an unconventional reservoir consisting of organic-rich black shale, with production occurring at vertical depths between 6,000 and 10,000 feet. The Marcellus Shale consists of organic-rich black shale, with production occurring at vertical depths between 5,000 and 8,000 feet.

24.     Non-party EnCap Investments L.P. ("EnCap") is the Company's largest shareholder owning approximately 39.0% of the outstanding shares of Montage Common Stock as of September 11, 2020. EnCap was consistently involved and consulted throughout the sales process and Individual Defendant Swanson is the Managing Director of Encap. Contemporaneously with the execution of the Merger Agreement, Southwestern and EnCap entered into a Support Agreement, pursuant to which EnCap agreed, among other things, subject to the terms and conditions thereof, to vote all of its shares of Montage in favor of the Proposed Merger and the Shareholder Vote.

25.     Southwestern is an energy company engaged in natural gas and oil exploration,

development and production that operates through two segments: Exploration and Production and Midstream Services. Its operations in northeast Pennsylvania are primarily focused on the unconventional natural gas reservoir known as the Marcellus Shale. Through its affiliated midstream subsidiaries, it is engaged in natural gas gathering activities in Arkansas and Louisiana. Its operations are principally focused on the development of unconventional natural gas reservoirs located in Pennsylvania, West Virginia and Arkansas.

26.     On August 12, 2020, Southwestern issued a press release announcing the Proposed Merger, which states in relevant part:

## SOUTHWESTERN ENERGY ANNOUNCES AGREEMENT TO ACQUIRE MONTAGE RESOURCES

*At-market, all-stock, in-basin acquisition delivers step change in free cash flow, captures synergies and is accretive to all key financial metrics*

SPRING, Texas – August 12, 2020…Southwestern Energy Company (NYSE: SWN) and Montage Resources Corporation (NYSE: MR) today announced that they have entered into a definitive merger agreement under which Southwestern Energy will acquire Montage Resources in an all-stock transaction. Based on the 3-day average closing share prices of the companies as of August 11, 2020 and under the terms of the agreement, Montage Resources shareholders will receive 1.8656 shares of Southwestern for each Montage Resources share. The transaction is expected to close in the fourth quarter of 2020, subject to customary closing conditions, including the approval of the Montage Resources shareholders.

Highlights include:

- Represents a step change in free cash flow; approximately $100 million annual free cash flow beginning in 2021 based on current strip pricing;

- Accretive to per share financial metrics as well as leverage, margin and returns;

- Anticipated synergies of approximately $30 million in annual G&A savings captured following the transaction close, in addition to operational efficiencies;

- Maintains peer leading maturity runway and strong balance sheet;

- Combined company will be the third largest producer in Appalachia, expected total equivalent production of approximately 3 Bcfe per day; and

- Enhances economic inventory, with investment opportunities in proven, high-return Marcellus super rich and core Utica dry gas windows.

"This is an exciting step for Southwestern as we expand our Appalachia footprint with the high-quality assets of Montage. As we have consistently stated, we are firm believers in the benefits of value-creating consolidation. This transaction further solidifies the Company's position as a premier Appalachia operator and provides additional scale and synergies strengthened by our leading operational execution. Consistent with our strategy, this transaction is expected to deliver increased free cash flow, improved returns and long-term value to shareholders," said Bill Way, Southwestern Energy President and Chief Executive Officer.

Way continued, "This acquisition is expected to deliver on all criteria of an accretive, value-adding transaction for the shareholders of both Southwestern Energy and Montage Resources. Southwestern Energy has consistently and methodically taken steps to enhance its resilience over the last few years, and this transaction solidifies that path and delivers on the commitment to responsibly manage the balance sheet and return to free cash flow."

John Reinhart, President and CEO of Montage Resources, commented, "This transaction creates a compelling opportunity for both Southwestern Energy and Montage Resources shareholders to benefit from the strength of the consolidated company. The combination creates a Company of substantial scale with capabilities to enhance cash flow generation and a strong balance sheet that provides opportunities for enhanced shareholder value creation. We appreciate all of the great work by Montage employees in forming a very attractive business that will continue to build upon the success of Southwestern Energy."

Concurrently, Southwestern also commenced a registered underwritten public offering of 55,000,000 shares of its common stock, with the proceeds expected to be used to retire a portion of Montage Resources' 8.875% Senior Notes due 2023. The remaining portion of the Montage notes outstanding have the potential to be refinanced opportunistically.

This transaction delivers on the key strategic objectives that Southwestern Energy has been targeting:

- No premium transaction

- Enhances free cash flow

- Improves leverage ratio

- Capture of tangible synergies

- In-basin assets where technical and operating expertise can be leveraged

- High-quality inventory included in go forward development plans

- Retains peer leading maturity runway advisor.

27.       The Merger Consideration represents inadequate compensation for Montage shares. Prior to the execution of the Merger Agreement, wall street analysts projected price targets for Montage as high as *$10 per share* to be achieved *within the year*, far inferior to implied value of the Merger Consideration they are receiving. Moreover, since the announcement of the Merger Agreement, the Company's stock price has lost nearly 1/3 of its value as illustrated by the chart below:



28. Therefore, it is imperative that shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and cast an informed vote on the Proposed Merger.

## II. The Proxy Omits Material Information

29. On October 6, 2020, Defendants filed the materially incomplete and misleading Proxy with the SEC. The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, in breach of their duty of disclosure and in violation of the federal securities laws, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision in connection with the Proposed Merger.

The Misleadingly Incomplete Summary of the Sales Process

30. In the section summarizing the Background of the Merger, the Proxy states that Montage executed confidentiality agreements with multiple parties which contained standstill and "don't ask don't waive" ("DADW") provisions, but failed to disclose whether the confidentiality agreement entered into with Party B contained a customary "fall away" provision or remained in effect after the Merger Agreement. The Proxy states that each of the confidentiality agreements executed between Montage and Southwestern, Party A, and Party C contained customary fall away provisions. Moreover, pursuant to the Merger Agreement, Montage explicitly agreed not to "amend or grant any waiver, release or modification under, or fail to enforce, any standstill or similar agreement with respect to any class of equity securities of Montage or any of its subsidiaries except that, prior to the approval of the Merger Proposal, if, in response to an unsolicited request

from a third party to waive any 'standstill' or similar provision. . . ." Proxy at 105. The combination of these facts indicate that Party B was subject to a DADW provision that did not fall away and prevented them from making a superior proposal, facts that must be disclosed.

31.     The express communication of information concerning DADW provisions is material to Montage shareholders, because it bears directly on the ability of parties that expressed interest in acquiring the Company to offer them a better deal. The failure to plainly disclose the existence of DADW provisions that survive the execution of the Merger Agreement creates the false impression that Party B could have made a superior proposal. However, if their confidentiality agreements remained in effect, then they could only make a superior proposal by breaching the agreement—since in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Thus, the omission of this material information renders the descriptions of the confidentiality agreements the Company entered into in the Background of the Merger section of the Proxy misleading. Any reasonable shareholder would deem the fact that the most likely potential topping bidders in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information.

32.     Additionally, the Company must disclose why Party B was prejudiced as the only company subject to a DADW provision without a fall away.

The Misleadingly Incomplete Financial Projections

33.     First, the Proxy omits critical financial projections for Montage, Southwestern, and Pro Forma Southwestern, including net income projections (the "Net Income Projections"). Defendants elected to summarize multiple sets of financial projections, but they excised and failed to disclose the readily available Net Income Projections. By disclosing certain projections in the Proxy and withholding the Net Income Projections, Defendants render the summary tables of

projections on pages 81-82 of the Proxy materially incomplete and provide a misleading valuation picture of Montage and Southwestern. Simply put, net income projections are irreplaceable when it comes to fully, fairly, and accurately understanding a company's projections and value.

34.    Second, the Proxy only provides year 2021 projections for Montage, Southwestern, and Pro Forma Southwestern. However, Barclays utilized financial projections through year 2024 in preforming its valuation analyses. These Later Year Projections must be disclosed, since their omission renders the projections disclosed and the summary of the analyses performed misleadingly incomplete.

35.    Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed—the others were concealed. If a proxy statement discloses financial projections and valuation information, such projections must be complete and accurate. The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, Defendants have disclosed some of the projections relied upon by Barclays and the Board but failed to disclose the Net Income Projections and the Later Year Projections. These omissions render the summary of: the projection tables; Barclays' valuation analyses; and each company's financial picture in the Proxy misleadingly incomplete.

The Misleadingly Incomplete Summary of Barclays' Fairness Opinion

36.    The Proxy describes Barclays' fairness opinion and the various valuation analyses performed in support of their opinion. Defendants concede the materiality of this information in citing the fairness opinion and its valuation analyses among the "material" factors the Board

considered in making its recommendation to Montage shareholders. Proxy at 63; *see also* Proxy at 68 ("The following is a summary of the material financial analyses used by Barclays in preparing its opinion to the Montage Board."). However, the summary of the fairness opinion and analyses provided in the Proxy fails to include key inputs and assumptions underlying the analyses. Without this information, as described below, Montage shareholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place the fairness opinion in determining how to vote on the Proposed Merger. *See* Proxy at 68 ("Barclays believes that its analyses must be considered as a whole, as considering any portion of such analyses and factors, without considering all analyses and factors as a whole, could create a misleading or incomplete view of the process underlying its opinion."). This omitted information, if disclosed, would significantly alter the total mix of information available to Montage's shareholders.

37.     In summarizing the *Net Asset Valuation Analysis* prepared by Barclays for each of Montage and Southwestern, the Proxy fails to disclose the following key information: (i) the actual after-tax cash flows used for each case in each analysis; (ii) the discount rates used in the analysis; (iii) the inputs and assumptions underlying the discount rate ranges (including CAPM components).

38.     These key inputs are material to Montage shareholders, and their omission renders the summary of the *Net Asset Valuation Analysis* incomplete and misleading. As Professor Davidoff explained in a law review article regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis (very similar to a net asset value analysis) a banker takes management's forecasted cash flows, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such

choices include "the appropriate discount rate, and the terminal value…" Id. As Professor

Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id*. at 1577-78.

39.     Without the above-omitted information Montage shareholders are misled as to

the reasonableness or reliability of Barclays' analysis, and unable to properly assess the fairness

of the Proposed Merger. This is especially true here, given that the two essential components of

the analysis (cash flows and discount rates) are withheld. As such, these material omissions render

the summary of the *Net Asset Valuation Analysis* included in the Proxy misleadingly incomplete.

40.     Also, in summarizing Barclays' *Selected Comparable Company Analysis* and

*Selected Comparable Transaction Analysis*, the Proxy fails to disclose the individual multiples

of each company and transaction utilized in the analysis. A fair summary of a comparable

companies or transactions analysis requires the disclosure of the actual multiples for each

company or transaction used in the analysis. Merely providing a selected representative range

that a banker calculated without any further information is insufficient, as shareholders are unable

to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low

multiples in order to present the Merger Consideration in the most favorable light. Accordingly,

the omission of this material information renders the summary of these analyses provided in the Proxy misleading.

41.     Similarly, in summarizing Barclays' *Equity Research Analyst Price Targets Analysis*, the Proxy omits the individual price targets observed or the dates of those price targets. Instead, the Proxy only provides a range of the price targets for each company. Given the breadth of the price targets provided, it is unclear if those price targets were summarized fairly or present a skewed version of each company's value. The disclosure here is insufficient and renders the summary misleadingly incomplete.

The Misleadingly Incomplete Summary of Barclays' Conflicts of Interest

42.     The Proxy provides a misleading summary of the conflicts of interest facing Barclays. On pages 78-79, the Proxy states:

> [I]n the past two years, Barclays has performed and received fees for certain financial advisory services to Blue Ridge Mountain Resources, Inc. in connection with its merger with Eclipse Resource Corporation announced in August 2018. Montage is the resulting combined entity of such merger transaction. Further, an affiliate of Barclays is a lender under Montage's existing revolving line of credit facility.
>
> . . .
>
> In addition, Barclays and its affiliates in the past have provided, currently are providing, or in the future may provide, investment banking services to EnCap, and certain of its affiliates and portfolio companies and have received or in the future may receive customary fees for rendering such services, including (i) having acted or acting as financial advisor to EnCap, certain of its affiliates and/or portfolio companies in connection with certain mergers and acquisition transactions; (ii) having acted or acting as arranger, bookrunner and/or lender for EnCap, certain of its affiliates and/or portfolio companies in connection with the financing for various acquisition transactions; and (iii) having acted or acting as underwriter, initial purchaser and placement agent for various equity and debt offerings undertaken by EnCap, certain of its affiliates and/or portfolio companies.

43.     However, the Proxy fails to disclose the amount of fees Barclays received or expects to receive in performing these services for Montage and EnCap. Disclosure of "any compensation received or to be received as a result of the relationship between" a financial

advisor and the company it advises, or its related affiliates, is required pursuant to 17 C.F.R. § 229.1015(b)(4).

44.     It is critical for shareholders to be able to understand what factors might influence the financial advisor's analytical efforts. A financial advisor's own proprietary financial interest in a proposed transaction must be carefully considered when assessing how much credence to give its analysis. A reasonable shareholder would want to know what important economic motivations that the advisor might have. By failing to disclose the actual amount of compensation Barclays received or expects to receive from their other engagements, the Proxy provides a misleading description of the Barclays' conflicts of interest in direct violation of the federal securities laws.

45.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act and the Individual Defendants' duty of candor/disclosure. Absent disclosure of the foregoing material information prior to the Shareholder Vote, Plaintiff will be unable to cast an informed vote regarding the Proposed Merger, and is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I
### Against All Defendants for Violations of Section 14(a) of the Exchange Act

46.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

47.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection

of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

48.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

49.     Item 1015 of Regulation M-A requires "[a]ny report, opinion or appraisal relating to the consideration or the fairness of the consideration to be offered to security holders or the fairness of the transaction to the issuer or affiliate or to security holders who are not affiliates" to "[d]escribe any material relationship that existed during the past two years or is mutually understood to be contemplated and any compensation received or to be received as a result of the relationship between: (i) The outside party, its affiliates, and/or unaffiliated representative; and (ii) The subject company or its affiliates." 17 CFR § 229.1015.

50.     The omission of information from a proxy will violate Section 14(a) if other SEC regulations specifically require disclosure of the omitted information.

51.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Merger. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) the sales process of the Proposed Merger; (ii) financial projections for Montage and Southwestern; (iii) the valuation analyses performed by Barclays in support of its fairness opinion; and (iv) Barclays' conflicts of interest.

52.     In so doing, Defendants made misleading statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

53.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy states that Barclays reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided them, as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the financial projections and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Barclays' analyses in connection with their receipt of the fairness opinion, question them as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was

disseminated, to corroborate that there are no material misstatements or omissions.

54.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

55.     Montage is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

56.     The misrepresentations and omissions in the Proxy are material and Plaintiff will be deprived of his right to cast an informed vote on the Proposed Merger if such misrepresentations and omissions are not corrected prior to the special meeting of Montage's shareholders. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## <u>COUNT II</u>
## <u>Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act</u>

57.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

58.     The Individual Defendants acted as controlling persons of Montage within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's

operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

59.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

60.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger. They were thus directly involved in preparing this document.

61.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

62.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

63.     As set forth above, the Individual Defendants had the ability to exercise control

over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

64.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

<u>**COUNT III**</u>
**<u>Against the Individual Defendants for Breach of Fiduciary Duty of Candor/Disclosure</u>**

65.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

66.     By virtue of their role as directors and/or officers of the Company, the Individual Defendants directly owed Plaintiff and all Company shareholders a fiduciary duty of candor/disclosure, which required them to disclose fully and fairly all material information within their control when they seek shareholder action, and to ensure that the Proxy did not omit any material information or contain any materially misleading statements.

67.     As alleged herein, the Individual Defendants breached their duty of candor/disclosure by approving or causing the materially deficient Proxy to be disseminated to Plaintiff and the Company's other public shareholders.

68.     The misrepresentations and omissions in the Proxy are material, and Plaintiff will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote—the harm suffered is an individual and irreparable harm.

69.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the special meeting of Montage shareholders to vote on the Proposed Merger or consummating the Proposed Merger, until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 8, 2020                   **MONTEVERDE & ASSOCIATES PC**

                                          */s/ Juan E. Monteverde*
                                          Juan E. Monteverde (JM-8169)
                                          The Empire State Building
                                          350 Fifth Avenue, Suite 4405
                                          New York, NY 10118
                                          Tel: (212) 971-1341
                                          Fax: (212) 202-7880
                                          Email: jmonteverde@monteverdelaw.com

                                          *Attorneys for Plaintiff*